The 4th District Appellate Court of the State of Illinois has now convened. The Honorable Craig H.D. Armon presiding. Afternoon, counsel. We'll call 4-220643 and 0645. 1st Midwest Bank v. Thomas Rossi. Counsel for the appellant, please state your name for the record. Patrick Flaherty Mr. Flaherty, I have you down for 10 minutes, is that correct? That is correct, Judge. And co-counsel? Yes, Your Honor. Bruce Paff, also on behalf of the bank and plaintiff. Thank you. Mr. Paff, you're also down for 10 minutes? Yes, sir. Thank you. And counsel for the appellate, could you please state your name for the record? I'm Scott Howey, Your Honor. Thank you, counsel. Mr. Flaherty, would you like to proceed? I would, Judge. Good afternoon. May it please the court. On behalf of the Overstreet family, we ask that you return this case to the circuit court for a trial on disfigurement and loss of society only. It was error to deny a disfigurement instruction because Ms. Overstreet was profoundly disfigured and awareness is not and should not be an element of the claim. No statute, case law or jury instruction requires awareness. The Supreme Court effectively rejected an awareness requirement in Holston by finding that Ms. Holston suffered both disability and disfigurement on facts establishing that she was never aware of her disfigured condition. This court should not be the first to make awareness a requirement for several reasons. Counsel, I have a question for you about that. You filed a written motion for a new trial and discussed the question of awareness with the trial court. Is my understanding correct that in that written motion for a new trial, you conceded that Holston did not address the issue of awareness? I think I haven't looked at that recently, Judge, but it's my memory is that I conceded they didn't use the term awareness. They didn't expressly address it in those words. My argument was that by their actions, by finding that this was a woman who was unaware, was in a coma, but was still entitled to have a verdict sustained that included disability and disfigurement, they were by their actions affirming that there was no need to have awareness as an element of the claim. Okay, go ahead. So we believe making awareness a requirement is inconsistent with the basic fundamental policy of tort law, which is to hold the tortfeasor accountable for all the harm that negligent conduct causes. It also creates the moral hazard of encouraging greater risk in dealing with persons with disability, whether people with blindness or developmental disabilities. And if awareness is a requirement, what level of awareness is necessary? Does the victim have to be able to see the disfigurement? Do they have to understand what it is? Do they have to be embarrassed by it? Where do you draw the line? Well, can't you draw a line, counsel, on the fact that you're in a coma? None of that applies. Well, I'm not sure what the court means by none of that applies. By definition, a coma means essentially no conscious awareness of anything. Isn't that correct? That would be true. But if the ruling simply was there needed to be awareness and that this was a proper refusal of the instruction because there was no awareness, then you face this dilemma of where do you draw the line. In this instance, there might be total unawareness. Well, we're only drawing the line in the case in front of us. How about if she's in a coma, she has no awareness, and then we don't have to worry about gray areas, do we? I suppose the court could limit it to these facts and for that reason come to the conclusion that the court is suggesting. Obviously, we have the view that there shouldn't be an awareness requirement at all. And so that would be our position on it. Well, how would you draw the distinction between awareness of disfigurement and awareness of pain? For instance, if someone goes into a coma and then dies, and it's clear that, let's say, because of sores on her body or whatever else, that were she not in a coma, she'd be in a lot of pain. Would pain still apply? Damages for pain? No, Your Honor, we concede in our brief and we make a point of the distinction that pain by definition is a sensory experience. Disfigurement is not. The better analogy is between pain and disability. Your awareness of your disability is not necessary. Ms. Overstreet being totally unaware, as the court points out by virtue of her coma, was still entitled to compensation for disability. And I think Holston makes that emphatically clear. The Holston Court specifically concluded that awareness was not necessary for disability compensation. And we think because it's more analogous, disability is more analogous to the, to the disfigurement question, that there should be none of disfigurement. Pain is sui generis. It's, by definition, a sensory experience. If you don't experience it, you don't have it. With respect to loss of society, Your Honors, the zero award in this case raises two questions of law and one of fact. The law questions are whether direct next of kin testimony is required to sustain a loss of society award. And the second one is whether a jury is obligated to give weight to the presumption of substantial loss when no rebuttal evidence is presented. Well, on the first point you made, who's, who's arguing it's required? The trial court didn't so conclude. Why isn't that just a small amount? Well, the, the, the court did suggest, in fact, in its decision, and we quoted that in our brief, that the jury could have concluded that because they didn't hear from Tony, that he didn't suffer a loss. So the court expressly indicated that that wasn't that, in her mind, may have been a requirement. Well, the court was just speculating about that, but the court in denying the motion for a new trial made clear that it was not imposing requirement that Tony had to testify. Wasn't that true? I don't recall that that was the fact judge I probably have a more fresh memory of that than I refresh recollection of that than I do but what I do know is that by affirming the dismissal and sanctioning, I mean, by affirming the zero reward on grounds that the jury could have concluded that he didn't suffer a loss because he didn't testify that he did that by, by definition is concluding or is sanctioning the need to prove next of kin testimony. Let me change the verb concluding to consider it would be permissible for the jury to consider in deciding whether to award damages to Tony for loss of society that he never testified. Yeah, I think that I can't conclude I can't say to the court that that would be an improper consideration but it couldn't be the basis for when there's substantial other evidence of loss as there is in this case. And that's what distinguishes this I think from any other scenario that you might find. This is not a case of no next of kin testimony, and no other testimony. This is the case of no next of kin testimony and overwhelming undisputed and unrebutted testimony of loss. Both the young and both the Jones and the young say decisions make clear that you don't need direct testimony. We also believe that the jury was required to give weight to the presumption of substantial loss because no rebuttal evidence was presented affording no weight to the presumption is permissible I believe only when rebuttal evidence is presented the defendants in this case concede that no rebuttal evidence was presented here. And the last detailed in our brief is overwhelming. Based on this record and unrebutted presumption of substantial loss and significant evidence of actual loss, a new trial and loss of society is is warranted a finding of zero loss on these facts, a finding that a mentally ill unemancipated 15 year old boy would not benefit from the continued existence of his only meaningful parent is unsustainable as a matter of law. The jury either ignored a proven element of damages or made a decision that there's no reasonable relationship to the loss suffered. Either way, the award is against the manifest way to the evidence and it should be reversed. The new trial should be limited to damages and disfigurement because the sufficiency of the liability evidence is not disputed the damages are distinct from liability and there's no evidence of compromise defendants concede the sufficiency of the evidence, the argument of inseparability is defeated by the liability timeline, which shows that negligence is alleged to have terminated long before the disfigurement and loss of society are alleged to have occurred. The last negligent act is alleged on 12-24-07 when Cindy went into a coma. The disfigurement wasn't documented until May 9 of 2008, eight months later, and the loss of society didn't start until 7-20-14, seven years later. Even if the jury needs to distinguish between the mental health consequences caused by Cindy's illness and those caused by her death, that process doesn't implicate the defendants or liability in any way. The relevant evidence will pertain to Tony and not to the defendants. The reduction we rely on Miller v. Sarah Bush. We believe it's dispositive, write-offs are not benefits paid, and the statute doesn't permit a reduction for them so we request that you reaffirm Miller and modify the reduction to eliminate write-offs. With respect to defendants' motion for a new trial, based on evidentiary error, we ask that that be rejected. The sole basis for the motion is the article found by the family and delivered to the hospital. It's claimed that the testimony was so prejudicial that it prevented a fair trial. We believe that argument is defeated by the overwhelming evidence that was produced by the defendant himself, the two experts in the case, and most significantly, by the PowerPoint presentation that the defendant's own practice created, developed, and approved that shows that they were teaching about the risks and concerns of thiamine deficiency and Warnke's encephalopathy in 2007. Based on that, any evidence with respect to any inference the jury may have drawn from the thiamine article, from the family article, is clearly cumulative and the defendants have no capacity here to overcome the presumption that the jury followed the law in this case or no ability to dispute the overwhelming evidence that makes the thiamine inference that they think is so insignificant in these circumstances. And lastly, Judge. Thank you, counsel. Your time is up. We'll have an opportunity in rebuttal. Mr. Papp. Thank you. Thank you. Your honors, may it please the court. I appreciate the opportunity to address the constitutional issues that defendant has raised. The legislation was designed to change the legal and insurance culture that surrounds personal injury and wrongful death claims in Illinois. It's designed to encourage the early settlement of cases to discourage scorched earth defense tactics, to shorten dockets, to shorten the time to trial, and to reduce the financial pressures that injured plaintiffs feel between the time they're injured when their cause of action accrues and the time the case can be tried. As this court knows, many, many trial courts have upheld the statute. As I'm sure this court knows, the Cotton case came down Friday, opposing the statute. The Green case, which we've cited from Massachusetts, is the most recent out of state case. More than 40 states have prejudgment interest statutes. No statute has been held unconstitutional by any state. Let me ask this question. The defense says that the statute was passed in violation of the three readings rule. Are you contesting that? Yes, we are. So you mean the three readings rule was complied with in this case? That is our view, your honor. Will you explain how? Yes, your honor. The legislative record shows in this case that it was presented by title on three different occasions in each house. And moreover, I mean, Was the title presentation the number of the bill? Is that what you're saying? Was the title presentation simply the number of the bill as opposed to actually what the bill is about? Your honor, I don't know how the legislature considers that. I do know that it was presented three times. The bill was as required by the Constitution. The amendments to the bill were provided to all of the legislators before vote. And then, of course, there's the enrolled bill doctrine, which requires that the if there is action by the speaker and the Senate president, that it is conclusive evidence. And frankly, we believe separation of powers considerations mandate and affirmance on the three readings issue because of the enrolled bill doctrine, which is part of the Illinois Constitution. Did you write the brief for it? Love is the fact. The amicus brief. Is the fact. Can you hear me? Yes, I can. Your honor, you froze for a second. Perhaps I did, too. Yes. No. Nicholas Napustel wrote that brief. Well, the reason I ask is the brief cited a whole bunch of statutes, some recent and some very significant, where essentially it was says these are all passed in violation of the three readings rule. And if the three readings rule were to be followed, there would be hell to pay and chaos and because the legislature consistently violates. Is that your view, too? No, I did not interpret the brief in that way. What I interpreted it was that there are situations in our legislature which have become not uncommon where a bill is put forward and then the content is amended. That's that's a quick way of saying passed in violation of the Constitution of the state of Illinois. I disagree with that, your honor, because on each occasion, the bill was read by the legislature interprets that on three occasions. No, I'm referring to the other acts that the brief made reference to, which, according to the brief, and I think the brief made reference to prejudgment interest. All of these were passed in violation of the three readings rule. I did not read the brief to say that those bills were passed in violation of the three readings rule. Go ahead. Okay, if I may. The defense makes the view that the commercial prejudgment interest statute in Illinois that we've had for more than 100 years is discretionary and that makes it a legitimate statute as as compared to this statute. In fact, that is not true. There are two cases, one that we've cited in our brief, the Kehoe case, which makes it very clear that was a case where the trial court after jury trial. In a breach of contract case that was the appellate court reverse that finding saying for a breach of contract written instrument case within the meaning of the statute, it was mandatory to grant prejudgment interest. The commercial statute has five different types of conduct that will allow prejudgment interest, and it's only the fifth type for vexatious conduct that is discretionary. With respect to the jury trial issue that Council has raised our statute talks about the right to jury trial as heretofore enjoyed. We're talking about as enjoyed before the 1970 Constitution, there was no right to jury trial for prejudgment interest before the 1970 Constitution because prejudgment interest did not exist in cases like this, and it is only existed. There are no cases nationwide that say that the jury should decide prejudgment interest Council persistent citing an overruled decision from Tennessee. That was six years later, the Tennessee Supreme Court in mind, said that there is no right to jury trial on the issue of prejudgment interest. Our commercial PGI statute does not allow for the jury to decide it. Moreover, there is absolutely no reason to believe that if the jury was presented with what they needed to decide prejudgment interest that they could have resolved it in any way different than Judge Hansel did the statute is very clear from July one of 2021. If the verdict exceeds the highest written offer, then you calculate 6% per annum. That's it. So it wouldn't matter what the judge did it or jury did it, it would be the same result. With respect to counsel's defenses. Due process arguments and double recovery, they cite Ray bestos but Ray bestos from the, from the Seventh Circuit was a case where the plaintiff presented at trial evidence of interest. As one of his damage claims, and the Seventh Circuit quite rightly said plaintiff cannot recover prejudgment interest twice. We are not doing that in this case that's not what Judge Hansel did. Juries do not give prejudgment interest today, as asserted by the defense, this jury did not award prejudgment interest. There was no argument for it there's no spot in the verdict form, and there's no evidence that that happened. With respect to the this statute, it's far more beneficial to the defendants than in many other states. What we see in the green case from Massachusetts 12% for the day of filing with no one year grace period like we have with no offset for an offer made. Vermont's the same way Rhode Island's the same way New York is the same way, all cited in the green case. So, there is absolutely no reason to think that the results should be any different on due process grounds because all those cases said due process was not violated. On the issue of separation of powers it's very clear under our Constitution, article six section one the judicial power is vested in the Supreme Court appellate court and circuit courts. The jury is not a branch of government. The case of Rosetti versus Court of Claims says that fact finding bodies are not courts within the meaning of the judicial article. On the issue of special legislation. It's quite clear that the the key fact that distinguishes personal injury and wrongful death cases from other torts such as fraud, etc. Is it the personal injury plaintiffs have suffered physical harm to their bodily integrity, which is an important element of damages. Supreme Court commented on that in the Maximovic versus so Gallus case that is a legitimate basis to distinguish type of claim from the others. And as I said before, rational basis is to clear the dockets of cases to motivate early settlement, and to provide a remedy for the time value of money lost the plaintiff is injured at the time of the tort which in this case was 2012. The case took a very long time to get to trial. I would point out that there was a defense made an argument on duplication of damages because future damages are part of the calculation of prejudgment interest. In this case, Judge Hansel made clear in her second post judgment ruling that future damages were not awarded in this case, and that's found at page, a 12 of the appendix to defendants brief. I don't think this defendant has standing to raise that issue. And I'd lastly point out to the defense did not object to the fact that the jury did not decide the issue of set off for pre trial settlements were set off for the 1205 medical medical expenses. I see my time is up. Thank you, counsel. Thank you, Mr. Howie. Good afternoon, your honors and may it please the court. I am Scott Howie and I represent the defendants who are both at the Lance and at the leaves in these consolidated appeals. Dr. Thomas Rossi and the Peoria surgical group limited. Before addressing the bulk of the plaintiff's arguments, the court should take up another issue that makes those issues moot. One that Mr clarity address only glancingly. The fact that it's the defendants who are entitled to a new trial, because they were prejudiced by the admission of evidence that the trial court recognized as tantamount to a lay opinion on standard of care. And despite the courts attempts to cure that prejudice, its efforts came far too late to be presumed effective, not just the sheer time, but also the fact that the jury heard most of the plaintiff's case framed by the testimony the court would later strike the defendants appeal addresses the admission of that evidence, and the futility of the trial courts belated effort to stem the prejudice that resulted from it. So you're referring to the article found by the sister time in testimony about that article and how it was handled. That's correct, your honor was is my understanding correct that that whole subject was the subject of a motion eliminate filed by the defense prior to trial. It was, and the trial court decided that or denied the motion decided that it could evidence about it could be presented Is that correct, that's correct, the trial court expected that one of the plaintiff's experts would tie it up. And that didn't happen. Well, the reason I asked that is because I understand correctly the very first witness, sometime after your motion and lemonade was denied was Sandy timing, who proceeded to testify in part, not at length but at least in part about her online search and finding the article, how she wanted to use encephalopathy and a patient after gastric bypass surgery now she had given it to her parents, and then later on we heard what parents have done with that. Is my understanding correct that that's what she testified to. That's correct, your honor. Well, here's my question, counsel. The record shows no objection by the defense to this testimony. And then, Dr. Rossi was the second witness. And he was testifying as an adverse witness he testified about the same thing at some length about. In fact, how it was a position in Dr. Rifkin training position at all is often Rockford got ahold of this and my understanding correct that there was no objection made to these questions or answers by Dr. So I not not entirely correct your honor that with respect to the principal offending testimony that of the system is Tynan. That was the first witness and counsel trial counsel did object at the outset of as she began to testify about the process of discovering the article. And it's that process. Not so much the article itself but the Google search the discovery of the article itself. There's really what goes to the question of standard of care page 120 of the report of. Let's pause there I want to make sure I. My understanding is there was no objection made prior to her testimony on this subject. You're now telling me that that's not correct if the record shows an objection made in it to be real clear. It has to be an objection on the same grounds that you filed your motion eliminate trial court tonight. You're not telling us you did that. That's correct. You're on a right. Just as the the the witness Miss Tynan was beginning to testify about what she did to satisfy her curiosity which was the Google search trial counsel explicitly renewed his objection. That's the term he used. I'm renewing my objection. What about when Dr. Rossi was first with respect to Dr. Rossi. I am I'm not certain I have that in front of me your honor but that was not specific to the process of discovering the article. Dr. Rossi didn't have any personal knowledge of what the what the decedent sister did to discover the article. And it's really it's the fact that the sister was able to go online onto Google do a Google search and find this article and that that was presented as the functional equivalent tantamount to a standard of care opinion. That is what what's what was prejudicial to the defendants in this case. To the extent that there may have been questions about the article later on. That's a separate subject. But Miss Tynan's testimony about what she did to discover this and the implication given by that testimony explicitly described by the plaintiff as being the implication that if she could do it. This lay person could could do that if she could find it then Dr. Rossi a trained medical professional should have been able to do it. That's the essence of standard of care. And it is that testimony that the trial counsel did object to did renew his objection the objection that he had made in the motion of limine just prior to the to the witness taking the stand. That's, that's the subject and that's the place where this evidence for this issue is preserved for review. Dr. Rossi was asked specifically and testified about no. And he's in the note from Dr. Rifkin that Dr. Rossi your client said yes was family found articles of gastric bypass with post-op vomiting leading to Wernicke's encephalopathy. And he has no objection to any of that testimony. I think the focus of that question though was more than the existence of the article it does reference glancingly and obliquely refers to the family finding the article but the substance of that question goes to the existence of the article and the, the, the fact that it was, it came into the possession of the decedents treaters. Okay, go ahead. And as to the admission of the testimony the trial court recognized that the evidence of the sisters Google search was tantamount to a lay person's opinion on standard of care. And that word tantamount is especially significant here. Obviously that word means equivalence, if not quite identical and effectively the same, or is the trial court put it in this context, close enough to a medical opinion to make it improper for a lay witness to give it. And the word stands out tantamount because tantamount is how the lay testimony of a medical diagnosis was described in steel versus for being a hospitals. We relied on that case in our briefs. That's the case in the third district, where lay witnesses were allowed to testify improperly that the decedents rash look like chickenpox. And the third district agreed with the defendants argument that this was more than just a factual description of what the rash look like it was more than a description of appearance. Because the failure in that case to diagnose the condition was an issue testimony suggesting that the defendant should have done so what that someone else easily could have done so who wasn't even a medical individual that that was the implication that something should have been done. It wasn't. And that's the essence of standard of care. The court was especially critical of the implication that if untrained lay persons could recognize chickenpox, then the physician defendant should have done so. And that is exactly the circumstance here. In fact, the plaintiff argues repeatedly that if a preschool teacher could find the article that identified the patient's condition, then Dr. Rossi should have to. I'm not here to disparage preschool teachers some of the smartest people I know teach preschool. But what's relevant is that this was a witness who was not a medically trained professional was not a medical expert was not anyone who ought to have been giving testimony that went to standard of care. And just as in in steel, where the testimony was tantamount to a standard of care opinion and called for a new trial in that case, the equivalent testimony here equally tantamount to a standard of care calls for a new trial as well. In fact, the trial court recognized this is the trial court twice twice described the testimony of the sister as being tantamount to standard of care, recognize that this was a was a problem, particularly after the it was not tied up by the plaintiff's expert, as it previously been expected. And the trial court took an extraordinary step in attempting to cure that that prejudice, eight days after the jury had heard this testimony, and eight days after the jury had been had been hearing and more than a week's worth of additional testimony, and the plaintiff's case through this framing device. The trial court attempted to cure that error by striking the testimony and instructing the jury to disregard something they had heard eight days before plaintiff relies heavily on the presumption as the trial court did that a jury follows the instructions it's given. And of course we recognize and respect that presumption. But that's a presumption, and the presumption that a jury will follow such an instruction like that is limited by the boundaries of human ability. Supreme Court has long recognized that that humans have frailties, and the court has refused to treat jurors as robots that can wipe their memories clean of stricken evidence like so much corrupted computer code. That's especially true when the testimony is more than fleeting, as it was here, or the instruction is less than prompts, which certainly is the case here as well. Look to the decision of the Supreme Court in people versus how, where the Supreme Court drew a distinction to the usual situation, a situation where we're all familiar with where someone blurt something out. There's a brief statement or question or something that the jury shouldn't hear, but the trial court is able to nip it in the bud, keep it from taking root, and can address it immediately. Those are situations that the Supreme Court in how recognized to be very different from situations where the jury is allowed to marinate in that improper testimony. I want to go back and ask a question. There were three witnesses who testified about the article. One of them was Sandy Tynan, the sister. The second was Dr. Rossi himself. He talked about the note from the Rockford physicians. But another witness was Carolyn Overstreet, the mother of the patient Cindy Overstreet. And she testified that her daughter, Diamond, had sent her an email with the article about Wernicke's attached. And then after she received the article, she took it to OSF Rockford to hand it to one of the nurses who was caring for Cindy, and she testified that the nurse appeared shocked after reading the article. Is my understanding correct that there was no objection made by the defendant at any time to her testimony? There were hearsay objections made, Your Honor, not specific to the question of the article being inappropriate. Again, the hearsay objections were overruled? They were overruled. Well, of course, it's not hearsay, so they were properly overruled. But the question is, with regard to your claim about the inappropriateness of the subject, was there any objection made to Overstreet's testimony, Carolyn Overstreet's testimony about the article, where she got it, and how she was essentially supplementing her daughter's testimony about where she got it and what she did with it? Not specifically, no. But, again, Mrs. Overstreet, the mother of the decedent, didn't have the personal knowledge and was not testifying to the doing of the Google search, the specific things that the finder, the discoverer, Ms. Tynan, of the article did and testified to. And it is, again, that process and what the sister did and the implications as to what that meant for what the doctor should have done, that's the gist of the error here. Well, why doesn't your failure to object to the mother's testimony or Dr. Rossi's testimony or to make a clear objection, reaffirming that you were dealing with your motion on Monday was denied before Tynan testified, why doesn't that forfeit this objection on appeal? Because the gist of the objection is that Ms. Tynan was able and was permitted to testify to the process by which she found the article, the process, in other words, by which she reached, in essence, a lay diagnosis of the condition that was afflicting her sister. Well, I understand what she testified to. Maybe my question wasn't clear. My point is, with regard to testimony about the article, you had made a motion to eliminate and block it. The trial court denied it. In a medical malpractice case in 2021, Ockebyer v. Springfield Clinic, resolved by this court some six months before the trial in this medical malpractice case, we reaffirmed that when a party seeking to bar evidence with a motion to eliminate loses, that when that evidence comes up at trial, contemporaneous objections must be made or those objections are forfeited. It seems to me, one, you made no contemporaneous objection at all to the mother's testimony. Two, your objection, such as it was, we want to renew our objection without stating anything more, with regard to the sisters, might be enough, perhaps, but you also made no objection to Rossi's testimony, testifying as an adverse witness about all the material pertaining to this article. So why haven't you forfeited this issue on appeal? Because it is, again, the process by which Ms. Tynan found the article, the process of the Google search, testifying to something that she was able to do with the implication that the defendant should have done it as well, and the implications for the standard of care. The existence of the article itself is somewhat separate from that. It's a fine distinction, I recognize, but it's an important one. And to object to the fact that she is about to testify to that, that's a sufficient objection that is not equivalent to the same sort of testimony from the doctor himself or from the mother. Well, Dr. Rossi was asked, and he said, without objection, yes, or about Sandy Tynan being a preschool teacher at the time she did the search. She was asked if he remembered that. He said he didn't remember it, but that testimony was before the jury. And there was no objection to the impropriety of the testimony of the question itself. My recollection, though, is that the trial judge struck that testimony and barred further questions about the occupation of the person who found the article. That is my recollection, and that's a correct ruling, although the fact that the question was asked at all is further evidence of the reason that the evidence was being introduced in the first place. Again, an improper basis related to standard of care. I would like to spend a little bit of time addressing the pre-judgment interest issue. I'm happy to address any further questions the court might have about the new trial motions, but with respect to pre-judgment interest, if the court should determine that no new trial is in order, it must also address the constitutional validity of Section 213.03c of the Code of Civil Procedure. That's a statute that runs afoul of both the federal and state constitutions for a variety of reasons set forth in our appellate briefs, and I'm happy to try to address whichever ones the court would desire, but I would like to begin by touching on two of them. First is the burden on the right to a trial by jury, and second is the violation of the separation of powers. With respect to the burden on the right to trial by jury, Illinois recognizes that right as a fundamental one. The guarantee that prevents the General Assembly even from changing the number of jurors, as we learned in CACOS. Since the jury trial is a fundamental right, legislative burdens on it are judged according to strict scrutiny and must be narrowly tailored to serve a compelling state interest. But the pre-judgment interest statute violates that right by burdening it with a price for its exercise. Defendants who hope to have their day in court may only do so at the risk of being charged a premium of 6% annually on any adverse verdict, potentially up to 30% for five years, if they don't carry the day at trial. And this is no incidental cost or de minimis fee. To the contrary, the plaintiff in amicus vividly described a legislative scheme in which the threat of substantial pre-judgment interest is meant to discourage defendants from exercising their right to a jury trial. As they put it, the phrase that they tend to try to use is that it incentivizes defendants to settle instead. Well, with carrots like these, who needs sticks? That reference to incentivizing is a chilling euphemism, but it's also a candid acknowledgment that the incentive to settle is really the threat of what it might mean to exercise the fundamental right to a jury trial. A legislation that makes the threat possible, the new statute, is an intolerable burden on that right. Because that is a substantial burden on that fundamental right, it cannot pass strict scrutiny and therefore must be struck down. Thank you, counsel. Thank you. Mr. Flaherty. Thank you, Your Honor. The amount of time spent at trial on the Tynum article pales in comparison to the amount of time spent on the PowerPoint and on the expert testimony and on Dr. Rossi's own admission. And the weight of the Tynum article pales in comparison to the weight of the PowerPoint, the expert testimony, and Dr. Rossi's admission. If the jury determined that Dr. Rossi should have been aware of Warnake's, it was not because a preschool teacher discovered an article on the internet. It was because Dr. Rossi admitted it, his educational classes taught it, and both experts acknowledged it. The article is a red herring to distract from the mountain of evidence that defendants cannot and do not challenge. Mr. Flaherty, may I interrupt you? And I'm sorry, I'm going to divert you from this topic. I want to go back to disfigurement. Okay. In terms of a disfiguring injury, must the injury be apparent, apparent to the world at large? Just take that question. Yeah, I think the disfigurement has to be an observable, visually observable condition. Okay. I do think that's true. What if the injured party is blind? That's, yeah. Go ahead, I'm sorry, Judge, I didn't mean to interrupt you. What if the injured party is blind? She is visually unaware of the injury. And let's just take the circumstance where others around her do not inform her of her injury, whether it's scarring, whatever it might be, but a disfiguring injury. Would that person be able to claim disfigurement in an injury action? She would, Judge. It's the same as the comatose person or the person that's, for some other reason, cognitively unaware. The blindness simply prevents that person from seeing it themselves, just as the cognitive deficits might prevent somebody from understanding what it is that they actually might see. And so, no, I think that the people who are at risk here, by having a rule of requiring awareness, are blind people, people with developmental disabilities. Those are the populations we're excluding from legitimate compensation because of their underlying condition. That's not the policy of tort law in Illinois, and it shouldn't be a policy that we adopt here in this case. Okay, thank you. Yeah, a new trial based on evidentiary error requires more than speculation. And that's all the defendants have here, is to speculate that the inference they fear may have been drawn from Ms. Tynum's testimony served as the basis for the jury's decision, and that ignores all of the mountain of evidence that existed otherwise. It was cumulative, and they also are speculating that the jury disregarded their obligation to follow the law, the instruction, and follow the court's admonitions. It requires evidence to reverse based on evidentiary error, and they don't have it. Thank you. Thank you, Mr. Flaherty. Mr. Pfaff? Thank you, Your Honors. I'd like to address the Kacos case, which counsel discussed on the jury trial argument. Kacos made it very clear that it is the facts in controversy, the phrase in quotes, to which the jury trial right adheres. The facts in controversy in this case were, was Dr. Rossi negligent and did he harm Cynthia? Those are the facts in controversy, not interest. I would also point out the prejudgment interest right being statutory. The legislature can create a right, as it has with many other causes of action, such as consumer fraud, and not allow it for jury trial, and that's constitutionally permissible, and that's what happens here. The incentivizes settlement. Well, in fact, the idea is to incentivize early evaluation of cases. The common practice for malpractice defendants is to not address any settlement issues until all plaintiffs' experts have been deposed, which could be two years, four years, six years, or in this case, seven years from the tort. In essence, the plaintiffs get starved out. This is a remedy that's an ancillary statutory remedy that the legislature has provided for commercial cases and can constitutionally provide for those injured or killed by wrongful conduct. As we set forth, I think we mentioned in our brief, and Ittler commented on it in more detail, Warren Buffett's companies own GEICO, they're experts in insurance and investing money. 60 years, the average float for insurance companies on their money invested in the stock market is 10.2%. The 6% that plaintiffs under this statute get barely cut into that. So the idea that it's the business model of the insurance companies to hold out to the last minute, when a plaintiff has to accept what they can or go to trial, shows why this legislature chose to act as it did. I know counsel did not address vested right, but it's in their briefs. I would point out the case that says no party has a vested right to a remedy or a method or a procedure. And that's exactly what pre-judgment interest is. Also, counsel has not addressed the fact that an Illinois post-judgment interest has been held constitutional in Mikolajczyk versus Ford, the appellate court case that we've cited in our papers. That's not been distinguished at all. And the contractual pre-judgment interest statute has been held constitutional in 1920. I'll leave my argument at that. Mr. Howie, since this is a cross-appeal, you've got an additional five minutes for rebuttal. Thank you, Your Honor. I'd like to touch on some of what Mr. Pass has just addressed. Chiefly with respect to the question of what the statute is meant to incentivize. And apart from what the briefs say, that it's intended to incentivize settlement by discouraging the exercise of the constitutional right to trial by a jury, Mr. Pass describes that as incentivizing the avoidance, I suppose, of sharp practices, improper tactics, the common practice, what he describes, of what defendants do. And that's a reference in general, a very broad blanket reference to what statutes do and what the General Assembly addresses. And it's exactly what the Supreme Court has addressed in cases that deal with previous statutes and struck them down because of the intrusion on the separation of powers. The separation of powers argument in this case is found by analogy to the Best case, Best v. Taylor Machine Works in 1997, and the more recent LeBron v. Godley Memorial Hospital case in 2010. Those are cases where the Supreme Court recognized that the legislature had overstepped its boundaries, had invaded the judicial sphere of authority by attempting to mandate broad conclusions in specific cases. And what Mr. Pass describes as the legislature's attempt to address what defendants do in some general sense is exactly what the Supreme Court criticized in those cases. What the court recognized is that the legislature is not situated to be making the sorts of case-by-case determinations that those kinds of things call for. Mr. Pass can't point to anything that defendants in this case, that my clients did, that would qualify as sharp practices or inappropriate conduct or something that might have to be corrected through the exercise of a personal interest statute. That is a broad brush remedy that the General Assembly attempted to impose on every case, every wrongful death or personal injury case in the state. It's an improper encroachment on the inherent power of the judiciary, as Best described it, and attempts to make verdicts conform to a predetermined formula. Now, the General Assembly works as a blunt instrument. That's what legislation is. But what those cases have recognized and the basis for finding those statutes to be in violation of separation of powers is that the determination of whether to penalize a defendant for its own sharp practices is a case-by-case determination. And my clients and other defendants who haven't engaged in those sorts of practices ought not be penalized by the legislature as a general matter of what other defendants in other cases might do. I'm not here to defend Warren Buffett, but Mr. Pass' suggestion that Warren Buffett has a relevance to this case is only a recognition of the realities of the insurance market. Even Mr. Pass can't point to anything in the record that says Warren Buffett has been responsible for improper, inappropriate delays, certainly not in any way that would justify the exercise of a prejudgment interest penalty. And in fact, Mr. Pass doesn't even address the burden that I spoke about today, the burden on the right to trial by jury by charging defendants for it and by putting a legislative thumb on the scales of justice by artificially making defense cases too expensive, prohibitively expensive to try. It's inappropriate for the legislature to be making broad brush determinations where the realities of litigation and the appropriate spheres of authority as between the General Assembly and the judicial branch properly lead those decisions to the courts and allow the courts to make determinations about whether penalties are necessary or penalties are appropriate. And that goes to the general reason why the statute is unconstitutional. It's because it doesn't give proper deference to the judicial branch. That has a number of effects across a number of constitutional arguments that we have made, a number of constitutional provisions that are offended by the fact that it does not address those. I ask the court to recognize the statute as unconstitutional and to strike it down. Thank you, counsel. All right, we exhausted everyone's time. Looks like it. Thank you, counsel. The court will take this matter under advisement. The court stands in recess.